UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

MICHAEL J. LAWRENZ,

                          Plaintiff,

        v.                                          Case No. 22-cv-1473-pp

KATRINA BRUCKER, ADEYEMI FATAKI,
JOSETTE SMITH, SGT. STRENN,
NURSE PRACTITIONER BONNETT,
JUSTIN RIBAULT and CINDY BUCCHANON,

                          Defendants.

**ORDER GRANTING PLAINTIFF'S MOTION FOR LEAVE TO PROCEED WITHOUT PREPAYING FILING FEE (DKT. NO. 2), DENYING WITHOUT PREJUDICE PLAINTIFF'S MOTION TO APPOINT COUNSEL (DKT. NO. 4) AND SCREENING COMPLAINT UNDER 28 U.S.C. §1915A**

        Michael J. Lawrenz, who is incarcerated at Green Bay Correctional Institution and is representing himself, filed a complaint under 42 U.S.C. §1983, alleging that the defendants violated his constitutional rights. This decision resolves the plaintiff's motion for leave to proceed without prepaying the filing fee, dkt. no. 2, resolves his motion to appoint counsel, dkt. no. 4, and screens his complaint, dkt. no. 1.

**I.      Motion for Leave to Proceed without Prepaying the Filing Fee (Dkt. No. 2)**

        The Prison Litigation Reform Act (PLRA) applies to this case because the plaintiff was incarcerated when he filed his complaint. See 28 U.S.C. §1915(h). The PLRA lets the court allow an incarcerated plaintiff to proceed with his case without prepaying the civil case filing fee. 28 U.S.C. §1915(a)(2). When funds

1

exist, the plaintiff must pay an initial partial filing fee. 28 U.S.C. §1915(b)(1). He then must pay the balance of the $350 filing fee over time, through deductions from his prisoner account. Id.

On December 9, 2022, the court ordered the plaintiff to pay an initial partial filing fee of $1.28. Dkt. No. 6. The court received that fee on January 3, 2023. The court will grant the plaintiff's motion for leave to proceed without prepaying the filing fee and will require him to pay remainder of the filing fee over time in the manner explained at the end of this order.

## II. Screening the Complaint

### A. Federal Screening Standard

Under the PLRA, the court must screen complaints brought by incarcerated persons seeking relief from a governmental entity or officer or employee of a governmental entity. 28 U.S.C. §1915A(a). The court must dismiss a complaint if the incarcerated plaintiff raises claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. §1915A(b).

In determining whether the complaint states a claim, the court applies the same standard that it applies when considering whether to dismiss a case under Federal Rule of Civil Procedure 12(b)(6). See Cesal v. Moats, 851 F.3d 714, 720 (7th Cir. 2017) (citing Booker-El v. Superintendent, Ind. State Prison, 668 F.3d 896, 899 (7th Cir. 2012)). To state a claim, a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to

2

relief." Fed. R. Civ. P. 8(a)(2). The complaint must contain enough facts, accepted as true, to "state a claim for relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows a court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556).

To state a claim for relief under 42 U.S.C. §1983, a plaintiff must allege that someone deprived him of a right secured by the Constitution or the laws of the United States, and that whoever deprived him of this right was acting under the color of state law. D.S. v. E. Porter Cty. Sch. Corp., 799 F.3d 793, 798 (7th Cir. 2015) (citing Buchanan–Moore v. Cty. of Milwaukee, 570 F.3d 824, 827 (7th Cir. 2009)). The court construes liberally complaints filed by plaintiffs who are representing themselves and holds such complaints to a less stringent standard than pleadings drafted by lawyers. Cesal, 851 F.3d at 720 (citing Perez v. Fenoglio, 792 F.3d 768, 776 (7th Cir. 2015)).

B.     The Plaintiff's Allegations

The plaintiff alleges that he was confined at the Outagamie County Jail and at two Wisconsin Department of Corrections ("DOC") institutions—Dodge Correctional Institution and Columbia Correctional Institution—during the events described in the complaint. Dkt. No. 1 at ¶¶4-5. He says he was a

3

pretrial detainee while confined at the jail and that he "had become an inmate" in the care of the DOC while confined at Dodge and Columbia.[1] Id.

The plaintiff has sued four defendants who work at the jail: Nurse Practitioner Katrina Brucker, Dr. Adeyemi Fataki, Josette Smith, a mental health professional, and Sgt. Strenn. Id. at ¶¶7-10. He has sued one defendant who works at Dodge: Nurse Practitioner Bonnett. Id. at ¶11. And he has sued two defendants who work at Columbia: Dr. Justin Ribault and Cindy Bucchanon, the health services manager. Id. at ¶¶12-13.

1. *Outagamie County Jail Allegations*

The plaintiff alleges that while at the jail, he had a "severe mental breakdown,"[2] reported to staff that he had hallucinations and heard voices telling him to harm himself and that he did harm himself several times. Id. at ¶16. He references a July 30, 2016 incident where he crushed an insulated plastic coffee cup into pieces and swallowed them in an attempt to kill himself. Id. at ¶17. Jail staff allegedly x-rayed the plaintiff twice after the incident and, despite his complaints of pain, did not give him further medical care and told him that he was "faking his pain." Id. at ¶18. The plaintiff says that this cup-swallowing incident is not the basis of his lawsuit; he explains that he includes

---

[1] The plaintiff currently is confined at Green Bay Correctional Institution, another DOC institution, but he does not allege that he was confined there during the events described in the complaint.

[2] The plaintiff alleges that the breakdown was caused by, among other things, being held in isolation for long periods of time, having jail staff tell him that he'd be going away for a long time, being made to go weeks without a shower and "detoxing from a severe drug addiction." Dkt. No. 1 at ¶¶15-16.

4

it to show his pattern of harmful behavior and a corresponding lack of adequate treatment from jail staff. Id. at ¶20.

The plaintiff alleges that on August 30, 2016, while on the segregation unit, he told Sgt. Strenn, who was passing out lunch trays, that he was feeling suicidal and wanted to go back on observation. Id. at ¶21. Strenn allegedly responded that he believed the plaintiff was lying to get attention from staff and when the plaintiff reiterated his intent to self-harm, Strenn told him to stop lying and proceeded with passing out trays. Id. The plaintiff alleges that Smith, who was conducting her scheduled rounds on the segregation unit, arrived at his cell moments later. Id. at ¶22. He allegedly told Smith that he was upset by Strenn's disbelief of his intent to self-harm and that he wanted to go back on suicide watch; he alleges that Smith told him that "the majority of jail staff , her included," viewed his behavior as "acting out" and that if he continued to do so and "placed himself back on suicide watch," his placement to general population would be slowed down. Id. at ¶23. The plaintiff says that Smith suggested to him to "just quit it" and proceeded to the next cell. Id. He allegedly yelled at Smith to come back, which she did, and the plaintiff again told her that he was going to self-harm. Id. The plaintiff alleges that he then "took the reusable orange 6.5" plastic spork" that Strenn had given him with lunch and swallowed it, in front of Smith. Id. After the plaintiff swallowed the spork, Smith allegedly immediately reported it to Strenn, who was still on the unit; the plaintiff says that at that point, he was moved back to a holding cell. Id. at ¶24. The plaintiff says that about six hours later, staff gave him an x-ray in the

5

holding cell, which Brucker ordered, but no other medical care was provided at the time. Id. at ¶25.

The plaintiff alleges that the next day—August 31, 2016—Brucker reviewed the radiology report, which concluded: "No suspicious foreign body seen. Please note that non-metallic foreign body may not be visible, and if there is a high-index of suspicion, CT recommended." Id. at ¶26. Brucker and Dr. Fatoki allegedly knew the spork was plastic and "along with the high-index of suspicion supported by both Smith's eyewitness account and available security camera footage of the spork swallowing, chose to ignore the radiologist's recommendation for a CT." Id. at ¶27. Jail staff allegedly did not give the plaintiff further medical care at the time. Id. The plaintiff says that medical records show that Dr. Fataki believed that the spork should have been "visible on plain film." Id. at ¶28.

Over the next week, the plaintiff allegedly told jail staff multiple times that he had abdominal pain. Id. at ¶29. He says that he asked multiple times to be seen by the jail doctor or to go to a hospital. Id. The plaintiff alleges that on September 6, 2016, Brucker saw him at his cell door at which time the plaintiff asked her what would be done about the spork and Brucker said she was unsure and that the doctor would have to decide. Id. at ¶30. The plaintiff states that he then told Brucker he was experiencing numbness in his foot and leg. Id. Six days later (on September 12), Brucker saw the plaintiff in the exam room for his foot numbness. Id. at ¶31. The plaintiff says he asked Brucker about the spork, and she replied that the x-ray had been negative. Id. When

6

the plaintiff asked how this could give, given that he'd swallowed the spork, Brucker told him that he had probably passed it before the x-ray had been taken. Id. The plaintiff allegedly said that he had not had a bowel movement before his x-ray and he asked to be taken to the hospital, to which Brucker responded the doctor would need to make that decision and that she would consult the doctor about further care. Id. The plaintiff states that over the next week, he asked nursing staff several times if he would be taken to the hospital and staff responded that he should be patient and that it was "being looked into." Id. at ¶33.

The plaintiff alleges that he was transferred to Dodge on September 20, 2016. Id. at ¶34.

### 2. *Dodge Correctional Institution Allegations*

The plaintiff alleges that on the Health Transfer Summary prepared by the jail staff, someone noted that the plaintiff "swallows objects." Id. The plaintiff alleges that when he arrived at Dodge, he told staff he had swallowed a spork at the jail. Id. at ¶35. He says that on October 5, 2016, he had an x-ray that NP Bonnett ordered, and the x-ray concluded, "No radiopaque objects were visible." Id. at ¶36. Bonnett allegedly knew that a plastic spork is non-radiopaque, but the plaintiff alleges that she chose to believe she had done her due diligence in providing medical care to the plaintiff. Id. The plaintiff says that she did not order any more medical tests or procedures despite the plaintiff's request for them. Id. Two days after the x-ray, the plaintiff allegedly saw medical staff, reported that he had pain in his stomach and that he

7

believed the spork was still in him and that he "would like a procedure to remove it." Id. at ¶37. The plaintiff states that four days later, on October 11, medical staff told him that he was constipated due to new prison food which probably caused his pain, and they gave him laxatives and he had a bowel movement. Id. at ¶38.

The plaintiff alleges that after his bowel movement, his abdominal pain subsided. Id. at ¶39. (He says it's possible that this is when the spork exited his stomach and became lodged in his small intestine. Id.) Dodge medical staff told the plaintiff that because he no longer experienced pain, they believed the issue to be resolved. Id.

The plaintiff alleges that his medical records show that Dodge medical staff received a call back from the *Manitowoc*[3] County Jail informing them that no incident involving the plaintiff swallowing a spork occurred there. Id. at ¶40. The plaintiff says that if this information had been reported to him, he would have been able to inform them that they called the wrong jail. Id. He states he believes this "egregious error sealed his fate that he would receive no more medical care from Dodge" medical staff. Id. The plaintiff says that because he had no more abdominal pain, and because of the continued reassurance by medical professionals that he no longer had the spork in him, he believed it to be so, and sought no more medical care at that time. Id. at ¶41.

---

[3] The plaintiff alleged that he was at the *Outagamie* County Jail when he swallowed the spork.

The plaintiff alleges that in spring 2020, while at Waupun Correctional Institution, he began having occasional stomach pain which intensified in frequency and intensity. Id. at ¶42. He says that in August 2020, he began to experience numbness in his hand and requested to be seen by medical staff for the numbness and abdominal pain. Id. at ¶43. A nurse allegedly saw the plaintiff on August 27, 2020 and told him she would make a referral for him to see the doctor. Id. The plaintiff states that the next day, he was transferred to Columbia. Id. at ¶44.

### 3. *Columbia Correctional Institution Allegations*

The plaintiff alleges that at his medical intake screening at Columbia on August 28, 2020, he told staff about his worsening stomach pain and Nurse Fitzpatrick (not a defendant) told him that Fitzpatrick was aware of the referral "from Waupun" and that the plaintiff would see the doctor in about a week. Id. at ¶45. The plaintiff states he had an appointment with Dr. Ribault scheduled for September 11, 2020, but he was informed that HSU cancelled his appointment. Id. at ¶46. He allegedly had two more appointments scheduled with Dr. Ribault, but either they were canceled or he never was called to the Health Services Unit. Id. at ¶¶47-48. The plaintiff alleges that on September 23, 2020, he spoke to Bucchanon while she was doing rounds, described his pain and his uncertainty over whether he had passed the spork and the problems he had seeing Dr. Ribault. Id. at ¶49. Bucchanon allegedly said that it was very unlikely the spork was still in the plaintiff and that she believed he had kidney stones. Id. Bucchanon allegedly said she would have the plaintiff

see the doctor in the next two days. Id. The plaintiff says that later that day, a nurse gave the plaintiff a urine test to check for stones or a urinary infection. Id. The plaintiff says that the next day, nursing staff informed him that he had an appointment with the doctor the following week. Id. at ¶50. He states that the appointment was for September 28, 2020, but he was never called to the appointment. Id. at ¶51.

The plaintiff alleges that he alerted three prison staff members about his cancelled doctor appointments, and they responded that they had forwarded his requests to Bucchanon. Id. at ¶52. On September 30, 2020, the plaintiff allegedly wrote Bucchanon and explained that he had not yet seen the doctor and that his pain had become extreme and unbearable. Id. at ¶53. He says he did not receive a response. Id.

The plaintiff states that on October 27, 2020, he finally saw Dr. Ribault and mentioned that he had swallowed a spork and wondered if it was still in him. Id. at ¶55. Dr. Ribault allegedly said that it was unlikely, and he thought the plaintiff had kidney stones, but he ordered a "CT" to rule out the spork. Id. The plaintiff states that on December 17, 2020, he went offsite for a CT and when he returned to Columbia, nursing staff told him a follow-up appointment with Ribault would be scheduled as soon as possible. Id. at ¶58. At the plaintiff's follow-up appointment with Ribault on February 2, 2021, Ribault allegedly told the plaintiff he was suffering from kidney stones. Id. at ¶63. The plaintiff states that he became agitated with Ribault and told Ribault his pain was extreme and something needed to be done, and Ribault told him he needed

to be more patient because "the majority of the inmates he sees are faking so it takes time to figure out who really needs his help or not." Id. at ¶64. Ribault allegedly said that he did now believe the plaintiff's pain to be genuine and he intended to help him. Id.

The plaintiff alleges that on March 3, 2021, he was taken offsite for a second "CT." Id. at ¶65. The results allegedly included findings "critical to the patient's care" that were reported to Ribault via telephone conference. Id. The plaintiff states that when he returned to Columbia, he was told he would need to go back to the ER. Id. at ¶66. The doctor at the ER allegedly told the plaintiff he had a large abscess in his intestine and that he would refer him to the UW Hospital in Madison. Id. The plaintiff says that when he returned to Columbia, nursing staff reviewed the ER report, called Ribault at home and he ordered the plaintiff to immediately be taken to the UW Hospital. Id. at ¶67. At the hospital, the doctors allegedly conducted a CT scan and saw the outline of a spork-shaped object. Id. at ¶68. UW staff allegedly concluded that the spork was visible on the December 17, 2020 CT, contradicting Ribault's diagnosis that the plaintiff's pain was caused by a kidney stone. Id. at ¶69. The plaintiff states that UW medical staff also identified an abscess measuring 4.9 cm x 2.3 cm. Id.

The plaintiff alleges that after two failed attempts to remove the spork endoscopically, on March 7, 2021, he underwent a laparotomy and gastrotomy foreign body removal which successfully removed it. Id. at ¶¶70-71. He says he had two drains placed in him and received thirty staples to close the incision;

the plaintiff says he spent the entire next week in intense pain recovering from the procedure. Id. at ¶72.

The plaintiff alleges that on March 13, 2021, he returned to Columbia. Id. at ¶73. He allegedly reported to staff that he had severe diarrhea and requested ammonium AD, which had been given to him at UW Hospital, but Columbia medical staff did not give him any. Id. The plaintiff states that Columbia medical staff was supposed to schedule him to return to UW Hospital for staple removal, but they did not do so; he says that when he pointed out to Columbia medical staff "that the time frame for removal set by U.W. medical had passed and that the staples were now red and inflamed," the staples were removed at Columbia. Id. at ¶75. The plaintiff alleges that he has severe scarring on his abdomen and ongoing digestive issues that require him to take daily medication to maintain normal bowel functions. Id. at ¶76.

        4.    *Claims*

The plaintiff claims that Brucker and Fataki showed deliberate indifference to his serious medical needs because they knew about his history of swallowing objects and that there was a "high-index of suspicion" that he swallowed the spork, yet they did not provide adequate care. Id. at ¶84. He also claims that they were negligent because they ignored the x-ray report from the trained specialist and that if they had ordered the CT scan based on the recommendation and the evidence available to them, surgical removal would probably have been avoided. Id.

The plaintiff claims that Smith and Strenn knew he needed medical care and failed to use their positions to ensure he got the care he needed. Id. at ¶85. The plaintiff also claims that Smith and Strenn failed to prevent him from harming himself, thus failing in their duty to protect. Id.

The plaintiff claims that Bonnett showed deliberate indifference to his serious medical needs because despite the plaintiff's complaints of pain and telling her he swallowed a spork, she chose to do the bare minimum in only ordering an x-ray. Id. at ¶86. The plaintiff also claims that Bonnett acted with negligence in ignoring the x-ray report, which made clear to her that non-radiopaque objects may not be visible. Id.

The plaintiff claims that Dr. Ribault showed deliberate indifference to the plaintiff's serious medical needs because he failed to see the plaintiff in timely manner and, once he saw the plaintiff, failed to treat him in a timely manner. Id. at ¶87. The plaintiff claims that this delay in care led to the plaintiff's prolonged, unnecessary, wanton pain and suffering. Id. The plaintiff also claims that Ribault was negligent in properly diagnosing and treating the plaintiff. Id.

The plaintiff claims that Bucchanon showed deliberate indifference by failing to act in her duty as health services manager to get the plaintiff care in a reasonable timely manner, thus inflicting prolonged, undue, wanton pain and suffering on the plaintiff. Id. at ¶88. He also claims that Bucchanon was negligent because he told her about the spork, she did not provide him care to rule that out and she ignored his requests. Id.

The plaintiff seeks declaratory relief, compensatory damages and punitive damages. Id.at ¶¶90-92.

C.    Analysis

1.    *Statute of Limitations*

The court first addresses the threshold question of the statute of limitations. The relevant statute of limitations for cases brought under §1983 is "the statute of limitations for personal injuries supplied by the state in which the claim arose." Huber v. Anderson, 909 F.3d 201, 207 (7th Cir. 2018) (citing Wallace v. Kato, 549 U.S. 384, 387 (2007)). The limitation period for §1983 claims arising in Wisconsin is the three-year limitation period in Wis. Stat. §893.54 (2018). Wisconsin previously allowed a six-year limitation period but in 2018 reduced that period to three years. See Huber, 909 F.3d at 207 (citing 2017 Wis. Act 235 (eff. Apr. 5, 2018), which reduces the applicable statute of limitations from six to three years). The three-year limitation period applies to causes of action accruing on or after April 5, 2018. Although untimeliness is an affirmative defense, the plaintiff may plead himself out of court "if he pleads facts that show that his suit is time-barred." Tregenza v. Great Am. Commc'ns Co., 12 F.3d 717, 718 (7th Cir. 1993).

The plaintiff alleges that the incident at the Outagamie County Jail in which he told Strenn and Smith he wanted to harm himself and then swallowed the spork took place on August 30, 2016. Because this incident occurred before April 5, 2018 (when state law reduced the limitation period from six years to three years), the six-year statute of limitations applies and the

14

plaintiff had until August 30, 2022 by which to file a complaint about the incident. He filed the complaint on December 8, 2022, which is over three months beyond the six-year statute of limitations. The plaintiff may not proceed against Strenn and Smith based on allegations that they failed to protect him from harming himself on August 30, 2016.

The plaintiff also alleges that after he swallowed the spork he received deficient medical care at the Outagamie County Jail, Dodge Correctional Institution and Columbia Correctional Institution. A §1983 claim to redress a medical injury arising from deliberate indifference to an incarcerated person's serious medical needs accrues when the plaintiff knows of his physical injury and its cause. Devbrow v Kalu, 705 F.3d 765, 768-69 (7th Cir. 2013). The statute of limitations starts to run when the plaintiff discovers his injury and its cause even if the full extent or severity of the injury is not yet known. Id. (citing Goodhand, 40 F.3d at 212).

The plaintiff alleges that he swallowed the spork on August 30, 2016, he was transferred from the Outagamie County Jail to Dodge on September 20, 2016 and in October 2016, medical professionals at Dodge told him he no longer had the spork in him. The plaintiff alleges that he believed this to be so (because he no longer had abdominal pain) and that he sought no more medical care at that time. He alleges that after he transferred to Columbia in August 2020, he told staff about his worsening stomach pain and expressed uncertainty over whether he had passed the spork. The plaintiff states that in March 2021, the spork was detected and surgically removed from his intestine.

15

The alleged lack of medical care that the plaintiff alleges took place at the Outagamie County Jail and Dodge (August through October 2016) occurred more than six years before he filed the complaint (December 2022) and thus might be time-barred. From October 2016 until the plaintiff transferred to Columbia in 2020, however, he apparently believed he had passed the spork (because Dodge medical personnel told him it was likely that he had). Without more details and given the plaintiff's assertion that it was not until March 2021 when he found out that the spork remained in his body, the court cannot conclude that these medical care claims are time-barred. While the defendants are free to raise the statute of limitations defense after they have been served, the plaintiff has not pled himself out of court regarding the statute of limitations for the alleged lack of medical care between August and October, 2016. At the screening stage, the court will not dismiss as time-barred the plaintiff's medical care claims based on events that occurred in 2016.

2. *Jail Allegations*

A §1983 claim that a state pretrial detainee has received inadequate medical care is predicated on the rights secured by the Fourteenth Amendment's Due Process Clause. James v. Hale, 959 F.3d 307, 318 (7th Cir. 2020) (citing Miranda v. Cty. of Lake, 900 F.3d 335, 346-47 (7th Cir. 2018)). Claims of inadequate medical care while in pretrial detention are subject to an objective reasonableness standard. Id. (citing Miranda, 900 F.3d at 352). The plaintiff bears the burden to demonstrate objective unreasonableness, and he must make a two-part showing. Id. First, he must show that the defendants

16

acted purposefully, knowingly or recklessly when considering the consequences of their response to the medical condition at issue in the case. Id. (citing McCann v. Ogle Cty., Ill., 909 F.3d 881, 886 (7th Cir. 2018)). Second, the plaintiff must show that the challenged conduct was objectively unreasonable given the totality of the relevant facts and circumstances. Id.

The plaintiff may proceed on a Fourteenth Amendment claim against Brucker and Dr. Fataki based on allegations that they did not provide him adequate medical care after he swallowed the spork. The plaintiff alleges that Brucker and Fataki knew that he swallowed the spork, but that they did nothing more than have him submit to an x-ray, which provided inconclusive results; the plaintiff asserts that they did not give him additional medical care despite his multiple requests for medical care that included complaints that he was in pain. The court will exercise supplemental jurisdiction over a state law medical malpractice claim against Brucker and Fataki. See 28 U.S.C. §1367(a).

The plaintiff has not, however, stated a claim against Strenn and Smith based on his medical care. The plaintiff alleges generally that Strenn and Smith failed to ensure that he received adequate medical care. But while Strenn and Smith knew the plaintiff had swallowed the spork, the plaintiff has not alleged any specific action they took to prevent him from receiving adequate medical care, or that they failed to take that resulted in his being prevented from receiving adequate medical care. The plaintiff's conclusory allegations against Strenn and Smith do not state a claim. See Iqbal, 556 U.S. at 678. The court will dismiss them.

17

### 3. *Dodge and Columbia Allegations*

A prison official violates the Eighth Amendment's prohibition against cruel and unusual punishment when he or she acts with deliberate indifference to the serious medical need of an incarcerated person. Cesal v. Moats, 851 F.3d 714, 720-21 (7th Cir. 2017) (citing Estelle v. Gamble, 429 U.S. 97, 104-05 (1976)). To state a claim for deliberate indifference for deficient medical care, the plaintiff "must allege an objectively serious medical condition and an official's deliberate indifference to that condition." Id. at 721 (quoting Perez v. Fenoglio, 792 F.3d 768, 776 (7th Cir. 2015)).

An objectively serious medical need is one that has either been diagnosed by a physician and demands treatment or is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Id. (quoting King v. Kramer, 680 F.3d 1013, 1018 (7th Cir. 2012)). The deliberate indifference standard is subjective and requires a plaintiff to allege that the official knew of, but disregarded, a substantial risk to the incarcerated individual's health. Id. (citing Farmer v. Brennan, 511 U.S. 825, 836-38 (1994); Greeno v. Daley, 414 F.3d 645, 653 (7th Cir. 2005)).

The plaintiff alleges that after he transferred to Dodge on September 20, 2016 and notified staff that he had swallowed a spork, Bonnett ordered an x-ray, which the plaintiff received on October 5, 2016. The plaintiff says that the x-ray did not show a spork and that Bonnett unreasonably relied on the x-ray and did not order further tests or procedures, despite his request for them. The plaintiff alleges that two days after the x-ray, he saw medical staff. Four days

18

after that, medical staff allegedly prescribed him laxatives because they thought he was constipated; he subsequently had a bowel movement after which his stomach pain subsided. (It is not clear if Bonnett was involved with the treatment the plaintiff received after she ordered the x-ray.) The plaintiff also alleges that Dodge staff inadvertently called the wrong jail and, as a result, received the incorrect information that the plaintiff had not swallowed a spork.

The court will assume for the sake of screening that having a plastic utensil lodged on one's intestinal tract constitutes a serious medical need. But the plaintiff's allegations against Bonnett do not state a claim for deliberate indifference because he alleges only that Bonnett acted unreasonably in ordering the x-ray. See Estelle v. Gamble, 429 U.S. 97, 106 (1976) (complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim under the Eighth Amendment). The plaintiff alleges that Bonnett should have known that a plastic utensil wouldn't necessarily show up on an x-ray, but alleging *unreasonableness* does not constitute an allegation of *deliberate* indifference. The plaintiff may not proceed on a constitutional claim against Bonnett. The plaintiff has, however, alleged sufficient facts to proceed on a state law medical malpractice claim against Bonnett for allegedly unreasonably not ordering additional tests on the plaintiff. The court will exercise supplemental jurisdiction over a state law medical malpractice claim against Bonnett. See 28 U.S.C. §1367(a).

Turning to the plaintiff's allegations against Bucchanon and Ribault, the plaintiff may proceed on a deliberate indifference claim under the Eighth

Amendment against them based on allegations that they delayed in providing him medical care for his stomach pain, which had returned by the time he transferred to Columbia in 2020. See Perez v. Fenoglio, 792 F.3d 768, 777-78 (7th Cir. 2015). The plaintiff also states a medical malpractice claim against Bucchanon and Ribault based on their alleged failure to properly diagnose and treat him. The court will exercise supplemental jurisdiction over the plaintiff's state law claim against Bucchanon and Ribault. See 28 U.S.C. §1367(a).

4.    *Summary*

The plaintiff may proceed on Eighth Amendment claims for deliberate indifference to a serious medical need against Brucker, Fataki, Ribault and Bucchanon. He may proceed on medical malpractice claims under Wisconsin state law against Brucker, Fataki, Bonnett, Ribault and Bucchanon. The plaintiff may not proceed on Eight Amendment medical care claims against Bonnett, Smith and Strenn because he does not allege that they acted with deliberate indifference to his serious medical needs. And he may not proceed on an Eighth Amendment failure-to-protect claim against Smith and Strenn because even if he had stated sufficient facts to support such a claim, the claim is barred by the statute of limitations. The plaintiff has stated no claims against Smith and Strenn and the court will dismiss them.

## III.    Motion to Appoint Counsel (Dkt. No. 4)

The plaintiff has filed a motion to appoint counsel. Dkt. No. 4. He states that he cannot afford a lawyer, that his imprisonment will greatly limit his ability to litigate and that this case involves complex issues that will require

20

significant research and investigation. Id. at 2. The plaintiff also states that this case requires expert witnesses, and he has no access to the witnesses. Id. The plaintiff states that he has limited access to the law library due to his current institution's (Green Bay Correctional Institution) policies and that he has little to no assistance from other incarcerated individuals. Id. He also says that he has a very limited knowledge and understanding of the law. Id. The plaintiff states that he has made repeated efforts to find a lawyer on his own. Id. at 3.

In a civil case, the court has discretion to recruit a lawyer for individuals who cannot afford to hire one. Navejar v. Iyiola, 718 F.3d 692, 696 (7th Cir. 2013); 28 U.S.C. §1915(e)(1); Ray v. Wexford Health Sources, Inc., 706 F.3d 864, 866-67 (7th Cir. 2013). "[D]eciding whether to recruit counsel 'is a difficult decision: Almost everyone would benefit from having a lawyer, but there are too many indigent litigants and too few lawyers willing and able to volunteer for these cases.'" Henderson v. Ghosh, 755 F.3d 559, 564 (7th Cir. 2014) (quoting Olson v. Morgan, 750 F.3d 708, 711 (7th Cir. 2014)).

In exercising its discretion, the court must consider two things: "(1) 'has the indigent plaintiff made a reasonable attempt to obtain counsel or been effectively precluded from doing so,' and (2) 'given the difficulty of the case, does the plaintiff appear competent to litigate it himself?'" Eagan v. Dempsey, 987 F.3d 667, 682 (7th Cir. 2021) (quoting Pruitt v. Mote, 503 F.3d 647, 654-55 (7th Cir. 2007)). And, given the scarcity of pro bono counsel resources, the court may also consider the merits of a plaintiff's claim and what is at stake. Watts v. Kidman, 42 F.4th 755, 763-64 (7th Cir. 2022).

To satisfy the first prong, the court must determine that a plaintiff made a good faith effort to hire counsel. Pickett v. Chi. Transit Authority, 930 F.3d 869, 871 (7th Cir. 2019). "This is a mandatory, threshold inquiry that must be determined before moving to the second inquiry." Eagan, 987 F.3d at 682. To demonstrate he satisfied the first prong, the plaintiff must show he contacted at least three lawyers and provide the court with (1) the lawyers' names; (2) their addresses; (3) how and when the plaintiff attempted to contact the lawyer; and (4) the lawyers' responses.

In particular, the lawyers' responses may have bearing on the court's decision to exercise its discretion because they may shed light on whether the plaintiff's attempts to hire counsel were reasonable. Pickett, 930 F.3d at 871. In deciding whether to recruit counsel, the court should consider the reasons the lawyer declined representation, including whether the plaintiff was unwilling (as opposed to unable) to pay a retainer; whether the lawyer lacked time or capacity to take on new clients; or whether the subject matter of the case requires a lawyer who specializes in a specific area of law. Id. The court should also consider how well the plaintiff articulated his case to the prospective lawyer. Id. Where a plaintiff "conveyed his situation well and counsel deemed the claim feeble, then it would be inappropriate for a court to intervene" and recruit counsel. Id. But, where a plaintiff is inarticulate, then a court "may have a useful role to play in recruiting counsel." Id.

"The second inquiry requires consideration of both the factual and legal complexity of the plaintiff's claims and the competence of the plaintiff to litigate

those claims." <u>Eagan</u>, 987 F.3d at 682. When considering the second prong, the court "must examine the difficulty of litigating specific claims and the plaintiff's individual competence to litigate those claims without counsel." <u>Pennewell v. Parish</u>, 923 F.3d 486, 490 (7th Cir. 2019). The court looks at "whether the difficulty of the case, factually, legally, and practically, exceeds the litigant's capacity as a layperson to coherently litigate the case." <u>Id.</u> This includes "all tasks that normally attend litigation," such as "evidence gathering, preparing and responding to court filings and motions, navigating discovery, and putting on a trial." <u>Id.</u> at 490-91. The court "must consider the plaintiff's literacy, communication skills, education level, litigation experience, intellectual capacity, psychological history, physical limitations and any other characteristics that may limit the plaintiff's ability to litigate the case." <u>Id.</u> at 491. In situations where the plaintiff files his motion in the early stages of the case, the court may determine that it is "impossible to tell whether [the plaintiff] could represent himself adequately." <u>Pickett</u>, 930 F.3d at 871.

The plaintiff has satisfied the first requirement of making a reasonable attempt to find a lawyer on his own. This case includes federal and state law claims against both county and state defendants, and the plaintiff is no longer incarcerated at the institutions where the events giving rise to his claims arose. These factors, together with the potential complexity of the issues involved in his medical care claims, weigh in favor of recruitment of counsel. On the other hand, this case is at an early stage and the plaintiff's filings show that his literacy and communication skills are very high. The court will order service of

the complaint on the defendants in this order, and it will order the defendants to respond to the complaint. After the defendants respond to the complaint, the court will issue a scheduling order setting deadlines for discovery and for the parties to file motions for summary judgment. If, after the court issues the scheduling order, the plaintiff believes he needs help litigating the case, he may renew his request for counsel. The court will deny without prejudice the plaintiff's motion to appoint counsel.

**IV.    Conclusion**

The court **GRANTS** the plaintiff's motion for leave to proceed without prepaying the filing fee. Dkt. No. 2.

The court **DENIES WITHOUT PREJUDICE** the plaintiff's motion to appoint counsel. Dkt. No. 4.

The court **ORDERS** that defendants Josette Smith and Sgt. Strenn are **DISMISSED**.

Service on State Defendants: Under an informal service agreement between the Wisconsin Department of Justice and this court, the court will electronically transmit a copy of the complaint and this order to the Wisconsin Department of Justice for service on defendants Bonnett, Ribault and Bucchanon. The court **ORDERS** those defendants to file a responsive pleading to the complaint within 60 days.

Service on Outagamie County Defendants: The court **ORDERS** the U.S. Marshals Service to serve a copy of the complaint and this order on defendants Brucker and Fataki under Federal Rule of Civil Procedure 4. Congress requires

Case 2:22-cv-01473-PP    Filed 07/07/23    Page 24 of 27    Document 8

the U.S. Marshals Service to charge for making or attempting such service. 28 U.S.C. §1921(a). Although Congress requires the court to order service by the U.S. Marshals Service, it has not made any provision for either the court or the U.S. Marshals Service to waive these fees. The current fee for waiver-of-service packages is $8.00 per item mailed. The full fee schedule is provided at 28 C.F.R. §§0.114(a)(2), (a)(3). The U.S. Marshals Service will give the plaintiff information on how to remit payment. The court is not involved in collection of the fee. The court **ORDERS** defendants Brucker and Fataki to file a responsive pleading to the complaint.

The court **ORDERS** that the agency that has custody of the plaintiff must collect from his institution trust account the **$348.72** balance of the filing fee by collecting monthly payments from the plaintiff's prison trust account in an amount equal to 20% of the preceding month's income credited to the plaintiff's trust account and forwarding payments to the clerk of court each time the amount in the account exceeds $10 in accordance with 28 U.S.C. §1915(b)(2). The agency must clearly identify the payments by the case name and number. If the plaintiff transfers to another county, state or federal institution, the transferring institution must forward a copy of this order, along with the plaintiff's remaining balance, to the receiving institution.

The court will send a copy of this order to Warden at Green Bay Correctional Institution.

The court **ORDERS** that the parties must not begin discovery until after the court enters a scheduling order setting deadlines for completing discovery and filing dispositive motions.

The court **ORDERS** that plaintiffs who are incarcerated at Prisoner E-Filing Program institutions[4] must submit all correspondence and case filings to institution staff, who will scan and e-mail documents to the court. Plaintiffs who are inmates at all other prison facilities must submit the original document for each filing to the court to the following address:

> Office of the Clerk
> United States District Court
> Eastern District of Wisconsin
> 362 United States Courthouse
> 517 E. Wisconsin Avenue
> Milwaukee, Wisconsin 53202

DO NOT MAIL ANYTHING DIRECTLY TO THE JUDGE'S CHAMBERS. It will only delay the processing of the case.

The court advises the plaintiff that if he fails to file documents or take other required actions by the deadlines the court sets, the court may dismiss the case based on his failure to diligently pursue it. The parties must notify the clerk of court of any change of address. The court advises the plaintiff that it is his responsibility to promptly notify the court if he is released from custody or transferred to a different institution. The plaintiff's failure to keep the court

---

[4] The Prisoner E-Filing Program is mandatory for all persons incarcerated at Green Bay Correctional Institution, Waupun Correctional Institution, Dodge Correctional Institution, Wisconsin Secure Program Facility, Columbia Correctional Institution, and Oshkosh Correctional Institution.

advised of his address may result in the court dismissing this case without further notice.

The court will include a guide prepared by court staff to address common questions that arise in cases filed by incarcerated persons. Entitled "Answers to Prisoner Litigants' Common Questions," this guide contains information that the plaintiff may find useful in prosecuting his case.

Dated in Milwaukee, Wisconsin, this 7th day of July, 2023.

BY THE COURT:

_____

HON. PAMELA PEPPER
Chief United States District Judge